United States District Court

District Of Connecticut

James A. Harnage  
Inmate #149472  
Corrigan CI  
986 Norwich-Newlondon Tpk.  
Uncasville, CT. 06382

vs

Dr. Omprekash Pillai  
1153 East St. South  
Suffield, CT. 06080

P.A. Rob  
1153 East St. South  
Suffield, CT. 06080

Dr. David Giles  
263 Farmington Ave  
Farmington, CT. 06030

Jane Doe  
263 Farmington Ave.  
Farmington, CT. 06070

Civil No.: Unassigned

Dated: 2/23/17

Jury Trial Demanded

Parties

Plaintiff

1. At all times herein mentioned the plaintiff, James A. Harnage (Harnage), is and was an Inmate, #149472, incarcerated within and for the State of Connecticut (the state) in the custody and care of the Department of Correction (DOC) being housed at the MacDougall Correctional Institute (MacDougall).

Defendants:

2. At all times herein mentioned the defendant Dr. Omprekash Pillai (Pillai) is and was a medical doctor for the University Of Connecticut (UCONN) Correctional Managed Health Care (CMHC) providing medical services to inmates at MacDougall, and sued herein in an individual and official capacity.

1

3. At all times herein mentioned the defendant, P.A. Rob (Rob), is and was a medical staff member providing medical services to inmates at MacDougall and sued herein in an individual capacity only.

4. At all times herein mentioned the defendant, Dr. David Giles (Giles) is and was a Surgeon for CMHC providing medical services to inmates at MacDougall and is sued herein in an individual capacity and official capacity.

5. At all times herein mentioned the defendant, Jane Doe (Doe), is and was a Surgical staff member providing medical services for CMHC to inmates at MacDougall and is sued herein in an individual capacity only.

Count One:

1-6. Paragraphs numbering 1-5 of the foregoing are incorporated here by reference as if set forth at length and made a part hereof this the First Count.

7. On or about September 2, 2015, Harnage was transferred from MacDougall to UCONN for surgical correction of an abdominal hernia, and 7-10 day recovery period.

8. On or about September 8, 2015, Harnage was transferred back from UCONN to MacDougall following a shortened recovery period by staff at UCONN whom did not like plaintiff enforcing his rights.

9. Upon the day of departure from UCONN, plaintiff had an emergency device known as a "PIC Line" inserted.

10. A PIC Line is a tube inserted in the main artery running underneath the plaintiffs right arm and fed, internally, across the plaintiffs chest and into the heart, using an ultra sound imaging.

11. The PIC Line is used to administer high doses of rapidly infused medications and draw blood for testing, when a patient is at high risk of emergency procedures and/or collapsing veins or circulatory issues.

2

12. At the time Giles ordered the Super Antibiotic and insertion of the PIC Line, Giles informed Harnage that his condition was serious enough to warrant another 2 days of hospitalization at UCONN, to further monitor plaintiffs abdominal infection.

13. Giles informed Harnage that, if his condition improved; Harnage would then be discharged from UCONN to the MacDougall infirmary where he would need to stay for at least another 7-10 days recovering under medical supervision.

14. Giles informed Harnage that the PIC Line would remain inside the plaintiff, for the remainder of his recovery period, and would not be removed until the day he was discharged from the MacDougall infirmary.

15. Following and incident with an intern, who was a member of the surgical team; wherein plaintiff informed staff he would not allow to examine the plaintiffs abdomen any more; Harnage was discharged from UCONN early, by Giles and Jane Poe.

16. Harnage was discharged on the same day that the PIC Line was inserted and no more than a couple hours after Giles informed Harnage that he would need to remain hospitalized for another 2 days.

17. Harnage was discharged despite a serious abdominal infection, that was causing high volumes of puss and blood discharge, and necessitating the prescription of a rapid infusion of high doses of a Super Antibiotic, that caused numerous of plaintiffs veins to collapse; making the insertion of the emergency device, PIC Line, necessary.

18. Upon return to MacDougall, Harnage was scheduled to remain in the infirmary for another 7-10 days.

19. After returning to MacDougall Harnage informed staff he needed legal documents from his cell and was denied.

3

20. Harnage was informed by staff that it was a policy within the infirmary, that patients were not allowed personal property until after they had been in the infirmary for 30 days.

21. Plaintiff insisted he had a right to his legal documents and was informed by staff that they would issue Harnage a disciplinary report if the plaintiff left the infirmary before speaking with Pillai in the morning.

22. The following morning, Dr. Pillai, without ever discussing anything with Harnage or asking why it was important that plaintiff retrieve legal documents from his cell the prior evening; discharged the plaintiff from the infirmary.

23. The plaintiff never requested to be discharged from the infirmary, just to retrieve legal documents and bring them to the infirmary.

24. Pillai, without being fully informed of the need for the PIC Line; removed the PIC Line from the plaintiff's arm and cancelled the prescription by Giles for the specialty antibiotics that the plaintiff was supposed to be taking.

25. Prior to Pillai removing the PIC Line, as he was preparing to do so; a female medical staff member on shift asked Pillai if he wanted to review Harnage's file or examine the surgical site prior to taking out the PIC Line.

26. Pillai said he did not need to do either.

27. At the time it was removed, the PIC Line, which had been ordered to handle the high doses of daily antibiotics; had not been used a single time.

28. Pillai also changed the plaintiff's prescribed pain relievers to eliminate altogether the intravenous, secondary pain reliever, intended to manage breakthrough pain; pain that went beyond that of plaintiff's primary pain reliever, Oxycontin.

29. When Pillai eliminated plaintiffs secondary pain reliever, he also changed plaintiff's primary pain reliever order from Oxycontin to Percocet, a less effective pain reliever that left Harnage in extreme pain and discomfort.

30. Pillai also changed the duration of plaintiffs pain reliever prescription from 4 weeks, down to 3 days.

31. Under optimal conditions, recovery from the abdominal hernia surgery is an estimated 6-8 weeks with longer periods of muscular rehabilitation.

32. However, plaintiffs condition was not optimal, Harnage had a severe abdominal infection.

33. In addition, the plaintiff is diabetic and diabetics take much longer to heal.

34. Further, Pillai eliminated the plaintiffs antibiotics, an antibiotic referred to by Giles as a "Super-Antibiotic" designed to specifically deal with very bad and extreme infections.

35. Pillai did not order any substitute antibiotics.

36. As the result of Pillai's conduct, the plaintiff suffered for weeks in needless pain and discomfort.

37. After the 3 days of pain reliever prescription expired, it took the plaintiff another 3 days, during which plaintiff had no pain reliever at all; to have the prescription renewed.

38. When Pillai finally renewed the prescription, Pillai would only renew it for another 3 days even though the original pain reliever prescription written by Giles was for 4 weeks.

39. When the second 3 day prescription expired, Pillai refused to renew the prescription.

39. Instead, Pillai ordered Ibuprofen for Harnage, which provided the plaintiff absolutely no pain relief for his surgical injuries.

40. Pillai's action, in prescribing the Ibuprofen, made it clear that he still had not taken any time to actually review the plaintiffs medical record.

41. The plaintiff was already on a prescription for high doses of Ibuprofen, which he has been taking for more than 20 years; to manage chronic pain; in his right hand, hip and lower back; and had developed a high tolerance for Ibuprofen, which offered little to no pain relief for other injuries.

42. When Pillai failed to review the plaintiffs medical records, he failed to see that Harnage's Ibuprofen prescription had recently been renewed for a full year.

43. Pillai's after the fact, callously written prescription superseded the plaintiffs original Ibuprofen prescription and reduced the dosage and length of the prescription to only a few weeks.

44. When Pillai's shortened prescription expired, it took plaintiff weeks, of writing endlessly; attempting to get his Ibuprofen order renewed, suffering the whole time.

45. Defendants knew or should have known that plaintiff would be harmed and injured by their actions, or lack thereof.

46. Plaintiff was harmed and injured as herein described suffering needless pain and delaying plaintiffs recovery by many weeks, as a direct and proximate cause of defendants actions, or lack thereof.

47. Each defendant had a duty to protect the plaintiff from the misconduct of each of the other defendants and failed in this duty, remaining deliberately indifferent to plaintiffs serious medical needs.

48. The plaintiffs infection grew worse requiring that, after several weeks without any antibiotics; Pillai was forced to order the plaintiff a new antibiotic.

49. While plaintiffs body was trying to fight the infection, without antibiotics; the plaintiff felt tired, listless, and found it difficult to sleep suffering needlessly.

50. Plaintiffs suture site became infected and began to open back up, causing greater scarring than would have been normally associated with the surgery, and greater pain and sensitivity at the suture site for many months.

51. After the plaintiffs infection in his abdomen finally healed, all the fluid that had built up, solidified into hematomas all throughout plaintiffs abdomen and chest.

52. The suture site went from plaintiffs navel to his sternum and some of these hematomas collected under plaintiffs ribs making it impossible for the plaintiff too breathe too deeply without great pain.

53. During recovery, plaintiff required care for his surgical site including a twice daily dressing change to keep the area clean and free of bacteria.

54. Defendant Rob, while performing one of Harnage's daily dressing changes, grabbed a corner of the clear plastic "Tegraderm" dressing cover, from the dressing and ripped it off of plaintiffs abdomen.

55. In maliciously ripping the Tegraderm off, Rob tore a full layer of skin off of the plaintiffs belly button, leaving the area raw and exposed.

56. Plaintiffs belly button, to that point, had survived unscathed, because the suture stopped at the top of the belly button area.

57. After Rob ripped the skin off, the infection from the abdomen spread into plaintiffs belly button, which swelled to be an outie, instead of the normal innie.

58. The defendants acted with a clear deliberate indifference to plaintiffs medical condition knowing he would be harmed and injured as herein alleged.

59. Plaintiff exhausted those administrative remedies, as were available to him, attempting to correct these conditions

60. Therefore, plaintiff prays this court grant the following relief:

a) Compensatory damages of $150,000⁰⁰
b) Punitive damages of $150,000⁰⁰
c) Costs and attorney fees
d) Such other relief as this court deems just and equitable

## Legal Claims

61. The defendants deliberate indifference to plaintiffs serious medical needs constitutes as cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution and excessive punishment in violation of Article First, Section 8 of the State of Connecticut Constitution.

## Statement Of Past Actions

62. The plaintiff brought a federal action on the same set of facts alleged herein, inter alia, and this court ordered the plaintiff to divide the claims into separate actions. See Harnage vs Woo, 3:16-cv-00625 (AWT) and Harnage vs Lightner, 3:16-cv-1576 (AWT). This complaint incorporates those claims as identified by the court as group (5), Doc. 10, pg. 27 of Harnage vs. Lightner.

## Jurisdiction

63. This action is brought to remedy the deprivation, under color of state law, of the plaintiffs rights guaranteed by the Eighth Amendment to the United States Constitution and Article First, Section 8 of the State of Connecticut Constitution, and state and Federal statutory rights. The Court has Jurisdiction pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1343(a)(3).

### Previously Dismissed Actions or Appeals

64. At the time of plaintiff's initial filing of these claims, the plaintiff did not have any actions that were dismissed as frivolous, malicious or for failure to state a claim. Thereafter, this court found that plaintiff had received a third strikes under the PLRA. That finding is presently on appeal and the plaintiff has not waived his appellate rights thereon.

### Jury Demand

65. The plaintiff is willing to discuss waiver of his right to jury trial. The plaintiff hereby preserves his right to a jury trial, until such actual waiver.

### Declaration Under Penalty of Perjury

66. I hereby declare under penalty of perjury that I am the plaintiff in the above action, that I have read the above complaint and that the information therein is true and accurate to the best of my knowledge and belief, and to those alleged upon information and belief I believe them to be true. I understand that if I lie in this complaint I could be prosecuted for perjury and punished with as much as Five (5) years in prison and/or fined up to $250,000.00

I therefore set forth my hand this the 23rd day of February, 2-17, executed at Uncasville, Connecticut.

By _____
James A. Harnage #148472
986 Norwich-NewLondon Tpk.
Uncasville, CT. 06382